OPINION OF THE COURT
Emily Pines, J.
In this case of first impression, the court is asked to determine whether the letter and spirit of a state law, designed to lessen the disparate economic positions of motor vehicle manufacturer and dealer, has been violated through the use of bonus incentive programs initiated by Volkswagen of America Inc. and its wholly owned subsidiary, VW Credit, Inc.
Plaintiffs, Audi of Smithtown, Inc. and Audi of Huntington, Inc., move for partial summary judgment, seeking an order (1) declaring what they term the “Defendant’s Incentive Programs” violative of the New York Franchised Motor Vehicle Dealer Act (Vehicle and Traffic Law art 17-A [Dealer Act]); and (2) permanently enjoining the defendant from engaging in conduct in violation of such statute. Defendant asserts that it is not violating the Dealer Act; that the entity engaged in the allegedly unlawful behavior is not covered by the Dealer Act; and that injunctive relief is inappropriate as the so-called unlawful activities have stopped.* Defendant moves separately for summary judgment dismissing the plaintiffs’ complaint on the grounds that no violation of the Dealer Act has occurred and that plaintiffs are, in any case, unable to demonstrate any disproportionate effect resulting from its subsidiary’s programs, since the benefits received by plaintiffs from participation in such programs proportionately meet and/or exceed those of a local new dealer.
The plaintiffs are franchised motor vehicle dealers. Defendant Volkswagen Group of America Inc., is a franchisor under section 462 (8) of the Dealer Act and operates under the name of VW/ Audi. VW Credit, Inc., not named as a party to this action, is a wholly owned subsidiary of VW/Audi and operates under the assumed name of Audi Financial Services (VW/AFS). Audi dealers, such as the plaintiffs herein, arrange financing for their lease customers through VW/AFS, the entity that owns the leased vehicles.
Plaintiffs assert that two interrelated incentive programs run by VW/Audi through its subsidiary VW/AFS, initiated in August *411 2007, violate the Dealer Act. In each of these programs, a motor vehicle dealer derives financial benefits based on the number of vehicles coming off-lease that such dealer agrees to purchase from VW/AFS. Under the first such program, known as the “Keep-It-Audi Program,” an existing dealer receives better pricing on pre-owned vehicles based on the percentage of returning off-lease vehicles it purchases from Audi/AFS. Under the “CPO Bonus Program,” the existing dealer receives pricing benefits on new vehicles based on the number of returning off-lease vehicles it purchases. The gravamen of plaintiffs’ complaint is that under both of these programs, a new franchise dealer is treated more favorably than an existing one, resulting in a discriminatory pricing scheme in direct violation of the Dealer Act.
Under the Keep-It-Audi Program, new dealers are automatically placed in what can be termed the highest participation category (“Champion”) without having to reach any of the returning off-lease vehicle bench marks required of existing dealers, and they are allegedly held to a lower, less costly standard than existing dealers.
Under this allegedly unlawful program, VW/AFS provides monetary bonuses and incentives specifically based on the number of off-lease vehicles purchased by the dealer for each quarter. Specifically, the program enumerates a dealer’s expected lease returns for a quarter. That number of expected lease returns, when reduced by 10%, is then stated to be the dealer’s “purchase objective.” To qualify in the category of dealers that receive the highest monetary rewards, a dealer must purchase a minimum of 80% of the “purchase objective” and a minimum of 70% of the “purchase objective” from each vehicle group (categorized as “compact,” “mid-size” and “full-size/ SUV”). The next category of dealers are called “Performers” and they must purchase 50% of the total “purchase objective” as well as 40% of the objective from each vehicle category in any quarter in which vehicles are returned from leases in order to receive slightly lower benefits in the following quarter. To achieve the third rung of benefits and acquire “Qualifier” status, a dealer must purchase 30% of its “purchase objective” and 20% of the “purchase objective” of returned lease vehicles for a particular quarter. The lowest category of dealership is termed “Non-Participant,” which constitutes those dealers that fail to meet the “Qualifier” status in the prior quarter. The “Non-Participants” receive none of the monetary benefits that are at the heart of this litigation.
*412 The specific benefits provided the dealer for achieving a higher bench mark include (1) increasingly discounted prices on lease returned vehicles; (2) a discount on other pre-owned and company vehicles purchased from VW/AFS off of auction, known as “AudiDirect”; (3) bonuses for each pre-owned vehicle sold by the dealer up to $600 per vehicle; (4) preferred access to company cars sold through AudiDirect; and (5) an advertising bonus of $100 for each off-lease vehicle purchased by the dealer. Plaintiffs allege that the “Keep-It-Audi Program” discriminates in favor of new Audi dealers because it automatically deems them to be “Champions” for a period of approximately three years. As stated in their papers in support of the motion for partial summary judgment, the discriminatory effect will continue after the new dealers are given an actual “purchase objective” when the three-year advantage period ends, because they will be starting from the standpoint of “Champion” status and, therefore, will be able to purchase lease return vehicles at lower prices than plaintiffs, which need to purchase hundreds of lease return vehicles each year at higher prices even to participate in the incentive program, albeit at lower, less favorable levels.
Under the second attacked benefit program, known as the “CPO Bonus Program,” the benefits affect the prices charged the dealers for new vehicles. Under the CPO program, each dealer is again given a “purchase objective,” similar to that in the other incentive program with regard to lease return vehicles. Beginning in 2009, existing dealers had to purchase 40% of this “purchase objective” and 30% of each “purchase objective” in each category of vehicles to participate in the program. The bench marks increased in 2010 to 50% and 40% respectively. The monetary reward for the qualifying existing dealers allowed them to receive back from Audi between 1.5% to 2.5% of the manufacturer’s suggested retail price for each new vehicle sold by that dealer during the next quarter. New dealers are permitted to participate in the CPO Bonus Program but the new dealers’ benefits are again not based on a percentage of lease return vehicles purchased. Rather, new dealers’ bonuses for new automobiles sold in the next quarter are based on the number of certified pre-owned cars they sell in the prior quarter, as opposed to the number of lease-end vehicles they purchase. Plaintiffs assert that because new dealers are already getting a bonus under the first incentive program on the price of lease-end cars they purchase, they start at an automatically preferred *413 position with regard to their ability to obtain certified pre-owned vehicles and, therefore, can reach the bonus goal at less cost proportionately than the plaintiffs. In addition, since the new dealers’ incentive under the CPO program is based upon automobiles they sell, they are free to find such vehicles at the lowest purchase price possible. Such option is not available to existing dealers whose bonus under the CPO program is based upon the percentage of lease returns they purchase only.
The Dealer Act forbids price discrimination in the sale of motor vehicles to franchised dealers.
Vehicle and Traffic Law § 463 (2) (aa) (1) provides: “It shall be unlawful for any franchisor . . . [t]o . . . sell directly to a franchised motor vehicle dealer . . . motor vehicles ... at a price that is lower than the price which the franchisor charges to all other franchised motor vehicle dealers.”
The Dealer Act also prohibits price discrimination in the sale of new motor vehicles where such discrimination arises from devices such as sales promotion programs that lower the actual price of the vehicle, unless such programs are available to all franchised dealers.
Vehicle and Traffic Law § 463 (2) (g) provides:
“It shall be unlawful for any franchisor . . . [t]o sell or offer to sell any new motor vehicle to any franchised motor vehicle dealer at a lower actual price therefor than the actual price offered to any other franchised motor vehicle dealer for the same model vehicle similarly equipped or to utilize any device including, but not limited to, sales promotion plans or programs which result in such lesser actual price . . . This paragraph shall not be construed to prevent the offering of incentive programs or other discounts provided such incentives or discounts are reasonably available to all franchised motor vehicle dealers in this state on a proportionately equal basis.”
The same act also forbids a franchisor from using its affiliates and subsidiaries to accomplish what is otherwise prohibited.
Vehicle and Traffic Law § 463 (2) (u) provides: “It shall be unlawful for any franchisor . . . [t]o use any subsidiary corporation, affiliated corporation, captive finance source or any other controlled corporation, partnership, association or person to accomplish what would otherwise be unlawful conduct under this article on the part of the franchisor.”
*414 VW/Audi asserts that Vehicle and Traffic Law § 463 (2) (aa) does not prohibit any actions occurring under the “Keep-It-Audi Program” because (1) Audi/AFS is the entity that sells lease return vehicles and it is not a “franchisor” and thus not subject to the statute’s prohibitions; (2) VW/Audi is not utilizing Audi/AFS to accomplish price discrimination; and (3) Audi/ AFS never “charges” dealers a price for a lease return vehicle that is lower than the price for which that particular lease return vehicle is sold to the dealers herein. According to defendant, VW/Audi and Audi/AFS jointly developed the two programs at issue in an effort to protect the residual value of new Audi vehicles by avoiding the sale of lease return vehicles at traditionally lower prices at auction houses, a completely lawful objective. The automatic bench marking of new dealers at the “Champion” level was created to enable new car dealers to participate in the lease return business during the first three years of operation, so that they could build an inventory of pre-owned vehicles. The CPO Bonus Program was allegedly developed by giving new dealers a certified pre-owned sales objective that would provide incentives to new dealers to purchase more lease return vehicles in order to meet the sales objective.
Thus, according to defendant, there is no evidence that VW/ Audi is using its subsidiary to engage in unlawful conduct. VW/ Audi does not own these lease return vehicles and, therefore, it is not using Audi/AFS to do its bidding. Defendant also argues that Vehicle and Traffic Law § 463 (2) (aa), which prohibits sales at a price lower than the franchisor charges to all other franchised dealers, cannot apply because the initial offer to sell for the so-called formula based price, lasts only two days (“grounding period”), and is made only to the dealer where the lease originated. No other dealer is offered the ability to purchase that particular vehicle during the grounding period at a lower price. Finally, defendant asserts that once the two-day program offering passes, any Audi dealer is free to purchase the off-lease vehicle at a price that is often lower than the so-called grounding price. Thus, in fact, the plaintiffs herein cannot show that they suffered any disparate impact.
With regard to the CPO Bonus Program, VW/Audi argues that the incentive offered only to new dealers, consisting of a bonus on a new car sales price based on the number of certified pre-owned vehicles sold, does not change the “actual price” of the new vehicle as set forth under Vehicle and Traffic Law § 463 (2) (g), since the bonus is applied in the following quarter. More *415 over, defendant asserts that the evidence demonstrates that the bonuses plaintiffs received under the CPO Bonus Program proportionately equaled and/or exceeded that received by a local new Audi dealer, thereby disproving a violation of section 463 (2) (g), since there is no evidence that the incentive program was offered to new dealers on a different proportionate basis.
In reply papers, plaintiffs set forth the following description of Audi/AFS, also known as VW Credit, as it appears on the defendant’s Web site:
“VW Credit, Inc. (VCI), a wholly owned subsidiary of Volkswagen Group of America, Inc., was founded in 1981 as the financial service arm of Volkswagen Group of America, Inc. VCI, a captive finance company, services Volkswagen, Audi and Bentley retail customers and dealers as Volkswagen Credit, Audi Financial Services, and Bentley Financial Services.
“The company provides competitive financial products and services to dealers and their customers throughout the United States including retail leasing, retail financing, and balloon financing, along with wholesale financing for new and used vehicles. We maintain a Remarketing Department for disposing of end-of-term lease/balloon contract vehicles, and all used company vehicles.”
Based on this language coupled with a 2008 amendment to Vehicle and Traffic Law § 463 (2) (u), to specifically prohibit a franchisor from using a “captive finance source” to accomplish otherwise unlawful conduct, plaintiffs assert that defendant cannot possibly hide behind Audi/AFS to prevent its liability for violation of Vehicle and Traffic Law § 463 (2) (aa).
With regard to the CPO Bonus Program, plaintiffs assert that defendant cannot utilize the argument that the bonus occurs in a different quarter than that in which the vehicle is actually sold to the customer to avoid application of the Dealer Act because Vehicle and Traffic Law § 463 (2) (g) broadly prohibits all devices, including incentive programs “which result” in lowering the actual sales price, thereby including those programs which, in effect, lower the price post-retail sale of the new vehicle.
Finally, plaintiffs allege that defendant’s profit calculations, utilized to demonstrate the lack of monetary damages suffered by plaintiff, are improper because only a true comparison of *416 costs and money taken in will demonstrate that the local new dealer achieved a significantly higher profit margin than plaintiffs. As the parties remain in the discovery stage on the issue of damages, plaintiffs assert that such are not in a position to be determined at this time in a summary judgment motion.
In a Memorandum in Support of Legislation, reprinted in the Governor’s Bill Jacket, Laws of 1983, chapter 815, the following legislative intent for the enactment of the Dealer Act is found:
“There is a great disparity in bargaining power between the motor vehicle manufacturer and the motor vehicle dealer. The franchise agreements which have been developed over a long course of dealing between the manufacturer and the dealer have reached a point where the dealer has few if any rights in comparison to those of the motor vehicle manufacturer ... In reality, the motor vehicle dealer who frequently has millions of dollars invested in dealership real property, equipment and good will can do nothing to oppose the will of the manufacturer without jeopardizing this substantial investment. This bill seeks to provide certain basic protection for the dealer in areas where such protection is deemed necessary. If enacted, the protection afforded the dealer through the terms of the bill would counterbalance the numerous protections afforded the manufacturer under the terms of its franchise agreement with the dealer. The result would be a healthier marketplace for all parties concerned.”
The gravamen of this case, and the outcomes of the instant motions depend primarily on the court’s reading of the language of the state statute and its consideration of applicability of such language to the facts herein asserted. This requires the court to ascertain the purpose of the statute and attempt to effectuate such purpose, through a review of statutory language itself as well as its legislative history. (Matter of Hogan v Culkin, 18 NY2d 330 [1966]; see McKinney’s Cons Laws of NY, Book 1, Statutes §§ 92, 95, 96, 97, 98, 111.) Where a statute is stated to be remedial in nature, the court must, in this context, consider the alleged wrong sought to be remedied by such legislation and construe the act to suppress the wrongdoing and advance the remedy set forth. (Matter of Dwyer, 192 App Div 72 [4th Dept 1920].)
A party moving for summary judgment must make a prima facie showing of entitlement to judgment as a matter of law, of *417 fering sufficient evidence to demonstrate the absence of any material issues of fact. (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985]; Zuckerman v City of New York, 49 NY2d 557 [1980].) Once a prima facie showing of entitlement to this relief is demonstrated, the burden then shifts to the party opposing the motion to produce evidentiary proof as to why the motion should not be granted. (State Bank of Albany v McAuliffe, 97 AD2d 607 [3d Dept 1983].) Where, as in the case at bar, both parties move for summary judgment, based upon differing views of statutory interpretation, summary judgment is generally appropriate. (See Spilka v Town of Inlet, 8 AD3d 812 [3d Dept 2004].)
As set forth by plaintiffs in support of their motion for summary judgment on their request for declaratory relief, the actions of defendant, Volkswagen Group of America Inc., in creating and implementing the “Keep-It-Audi Program” violated the letter and intent of the Franchised Motor Vehicle Dealer Act. The act specifically states that it is unlawful for a franchisor to sell directly to a franchised motor vehicle dealer motor vehicles at a price that is lower than the price the franchisor charges all other franchised motor vehicle dealers. (Vehicle and Traffic Law § 463 [2] [aa].) This act made it unlawful for any franchisor to use a subsidiary corporation, defined in a 2008 amendment specifically to include a captive finance source that provides lease contracts for motor vehicles, to accomplish what would otherwise be unlawful conduct on the part of the franchisor. (Vehicle and Traffic Law § 463 [2] [u]; L 2008, ch 490, eff Jan. 1, 2009.)
The fact that the entity actually running the incentive programs is not a “franchisor” is not sufficient to avoid summary judgment, where the franchisor itself states that it created the program in conjunction with that entity and that the stated purpose of increasing the residual value of lease return Audi automobiles would inure to the defendant’s financial benefit. There is nothing written in the language of the law itself nor in its clear legislative history, which sought to avoid abuses occasioned by the differential economic positions of franchisor and franchisee dealer, stating that section 463 (2) (u) would only apply where the dealer was able to demonstrate some sort of intent on the part of the franchisor. It is the act of violating the statute through the captive entity, and not the intent to violate the act itself, which is made unlawful under the subject section.
*418 Plaintiffs have demonstrated that defendant’s wholly owned captive finance source offered a financial incentive program which allowed the sale of lease return vehicles at differing prices, depending on their level of participation in the program, while placing new dealers in the highest participation levels, allowing the sale of such vehicles to them at prices significantly below the price sold to the existing dealers.
It is equally clear that the CPO Bonus Program, in which the defendant is a direct participant, violates Vehicle and Traffic Law § 463 (2) (g), which prohibits the sale of a new motor vehicle at a lower actual price than that offered to another franchised motor vehicle dealer for the same model through the use of a device which has the effect of offering a lesser actual price. While this statute has a “safe harbor” provision for incentive programs, the exemption will not apply where the discounts are not applied on a proportionate basis to all franchised dealers.
There is no manner in which the bonus offered on new automobile sales under the CPO program to new automobile dealers is proportionately similar to the bonus offered existing dealers. New dealers receive their bonus, reflected in lower prices on new cars, based on their sale of certified pre-owned automobiles they are permitted to purchase. New dealers can obtain the inventory necessary to obtain lower sale prices on new vehicles through the use of their advantageous position in the Keep-It-Audi Program. The existing dealers’ bonus under the CPO program is again totally dependant on the percentage of lease return vehicles they are able to purchase. Plaintiffs have already established that they are at a financial disadvantage with regard to the price they are charged for those vehicles because new dealers are placed in the highest bonus category without need to have any preexisting expenditures.- In effect, existing dealers are required to purchase most of their preowned vehicles at the highest cost if they are to have any opportunity to receive the benefits of these two incentive programs, while new dealers are free to purchase their preowned inventory at lower prices from auction houses and thereby secure the benefits of both programs.
The Legislature made it clear that this was a remedial statute, enacted to improve the marketplace by attempting to equalize the disparate economic positions of automobile manufacturer and automobile dealer. The court finds that plaintiffs have demonstrated, as a matter of statutory construction and its applica *419 tion to this case, that the two programs at issue violate both the letter and the spirit of the Franchised Motor Vehicle Dealer Act.
As plaintiffs have demonstrated their entitlement to summary judgment as a matter of law on their declaratory judgment cause of action, it is hereby ordered, that the plaintiffs’ motion (motion sequence No. 004) for partial summary judgment on their declaratory judgment cause of action is granted; and it is further ordered, that the defendant’s motion (motion sequence No. 005) for summary judgement dismissing the plaintiffs’ complaint is denied.

 Counsel for both parties have agreed that plaintiffs’ cause of action for a permanent injunction has been rendered moot and is withdrawn.